# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### VALDOSTA DIVISION

## QUESTIONNAIRE FOR PRISONERS PROCEEDING
### PRO SE UNDER 42 U.S.C. §1983

IN THE U... CLERK'S OFFICE 2014 FEB 24 AM 8:40 U.S. DISTRICT... MIDDL... MIDDLE... GEORGIA MACON, GEORGIA

Christopher A. Lynch, MS.D.,
GDC# 1000768589
a/k/a "Christina"

(GIVE FULL NAME AND PRISON NUMBER OF EACH PLAINTIFF):

**Plaintiff(s)**

VS.

Sharon Lewis, M.D. ; Billy Nichols,
M.D. ;

(NAME OF EACH DEFENDANT)

**Defendant(s) ;**
in their personal and official capacities

CIVIL ACTION NO. 7:14-CV-24

## I. GENERAL INFORMATION

1. Your full name **and** prison number  Christopher Lynch 1000768589

2. Name and location of prison where you are **now** confined  Valdosta State Prison
P.O. Box 310, Valdosta, GA 31603

3. Sentence you are now serving (how long?)  30 serve 14; parole eligible @ 1/3

  (a) What were you convicted of?  pimping, pandering, sexual exploitation

  (b) Name and location of court which imposed sentence  Douglas County Superior
Court, Douglasville, GA

  (c) When was sentence imposed?  March 11, 2012

  (d) Did you appeal your sentence and/or conviction?  ☐ Yes  ☑ No

  (e) What was the result of your appeal?

  (f) Approximate date your sentence will be completed  March 2025 if maxed out

## II. PREVIOUS LAWSUITS

**4. Other than the appeal of your conviction or sentence, have you ever submitted a lawsuit for filing in <u>any</u> federal or state court dealing with the <u>SAME FACTS</u> involved in this lawsuit or otherwise related to your imprisonment?**  ☐ Yes  ☑ No

**5. If your answer to question 4. is "Yes," list that lawsuit below, giving the following information:** (IF YOU HAVE FILED MORE THAN ONE LAWSUIT, LIST OTHER LAWSUITS ON A SEPARATE SHEET OF PAPER, GIVING THE SAME INFORMATION FOR EACH)

(a) Parties to the previous lawsuit:

Plaintiff(s): _____

_____

Defendant(s): _____

_____

(b) Name of Court: _____

(c) Docket Number: _____ When did you file this lawsuit? _____

(d) Name of judge assigned to case: _____

(e) Is this case still pending  ☐ Yes  ☐ No

(f) If your answer to (e) is "No," when was it disposed of and what were the results? (DID YOU WIN? WAS THE CASE DISMISSED? DID YOU APPEAL?)

_____

_____

## III. PRESENT CONFINEMENT

**6. Where are you <u>now</u> confined?** Valdosta State Prison

(a) How long have you been at this institution? since July 23, 2013

(b) Does this institution have a grievance procedure?  ☑ Yes  ☐ No

(c) If your answer to question 6(b) is "Yes," answer the following:

(1) Did you present your complaint(s) herein to the institution as a grievance?  ☑ Yes  ☐ No

(2) What was the result? Warden Allen rejected my grievance; I appealed to the GDC Central Office

(d) What, if anything, have you done to bring your complaint(s) to the attention of prison officials?  Give dates and places and the names of persons talked to.

Please see Statement of Claim

_____

_____

7. In what other institutions have you been confined? Give dates of entry and exit.

- Central State Prison = July 2012 - December 2012
- Jenkins Correctional Center = December 2012 - March 2013
- Johnson State Prison = March 2013 - July 2013
- Valdosta State Prison = July 2013 - Present

## IV. PARTIES TO THIS LAWSUIT

8. List the name and address of <u>each</u> plaintiff in this lawsuit.

9. List the full name, the official position, and the place of employment of each defendant in this lawsuit. (ATTACH ADDITIONAL PAGES IF NECESSARY)

- Sharon Lewis, M.D., - Medical Director of Georgia Dept. of Corrections
- Billy Nichols, M.D. - Medical Administrator w/ GDC via Georgia Medical College

- Georgia Department of Correction
(State Offices South) Gibson Hall 1st Floor
(P.O. Box 1529) 300 Patrol Rd. Forsyth, GA 31029

## V. STATEMENT OF CLAIM

10. In the space hereafter provided, and on separate sheets of paper, if necessary, set forth your claims and contentions against the defendant(s) you have named herein. Tell the court <u>WHAT</u> you contend happened to you, <u>WHEN</u> the incident(s) you complain about occurred, <u>WHERE</u> the incident(s) took place, <u>HOW</u> your constitutional rights were violated, and <u>WHO</u> violated them? Describe how <u>each</u> defendant was involved, including the names of other persons who were also involved. If you have more than one claim, number and set forth each claim SEPARATELY.

Do not give any legal argument or cite any cases or statutes at this time; if such is needed at a later time, the court will advise you of this and will afford you sufficient time to make such arguments. KEEP IN MIND THAT RULE 8 OF THE *FEDERAL RULES OF CIVIL PROCEDURE* <u>REQUIRES</u> THAT PLEADINGS BE <u>SIMPLE</u>, <u>CONCISE</u>, AND <u>DIRECT</u>! If the court needs additional information from you, you will be notified.

**Where did the incident you are complaining about occur? That is, at what institution or institutions?** Valdosta State Prison

**When do you allege this incident took place?** Between July 23 — Present

**What happened?**

## • INTRODUCTION •

This complaint is brought by Dr. Christopher A. Lynch, a/k/a "Christina."

I am a 22 year-old transsexual inmate currently incarcerated at Valdosta State Prison. Throughout the great majority of my life, beginning around age 9, I have dressed, appeared, matriculated, and been employed as female. I express and identify as female. I grew up in the custody of the Maryland State Department of Social Services, a "product of the system," and I was never permitted treatment by specialists for my Gender Identity Disorder ("GID"). I consumed female hormones illicitly from age 15 on up. I ran away to Georgia at age 17 and was incarcerated by age 19.

I never had the means to legitimately recieve help for my GID. I never had the means to be treated by a physician or monitored via psychotherapy by a psychologist. During my incarceration I have been denied any and all care for GID simply because I had not been recieving such care, officially, prior to my imprisonment. The decision to deny care was generated by Dr. Sharon Lewis and Dr. Billy Nichols, and was based upon an unconstitutional Georgia Department of Corrections' policy maintained by Drs. Lewis and Nichols. ███████ The policy utilized is S.O.P. VH47-0006.

## • MEDICAL FACTS •

Transsexualism, or Gender Identity Disorder ("GID"),

is a serious medical condition. Currently, the American Psychiatric Association ("APA") uses the terminology "Gender Dysphoria", having renamed the condition. Described as "persistent cross-gender identification", with "clinically significant distress or impairment of functioning."

The American Medical Association ("AMA") has enumerated the basis of care stating "hormone therapy and surgery" provide the necessary relief for the transsexual patient. (citing Encyclopedia of Medicine 1006 (1989)).

Psychotherapy has been acknowledged as the appropriate instrument to monitor the mental welfare of the transsexual patient during his/her transition; but is generally not considered a "treatment" for GID.

## • COMPLAINT IN FULL •

On 7/23/13 I arrived at Valdosta State Prison. At my last prison I had begun seeking treatment for my transsexualism, but hadn't made it any further then an unofficial diagnosis of GID by the psychiatrist, Dr. McKinnon. Upon my arrival to VSP I began to try once again to be evaluated and treated for GID. The usual treatment plan consists of hormone therapy as the primary care and therapy to monitor the transition's successfulness. I sought this appropriate care.

I spoke with many different prison staff ( Mental Health

Director, Psychiatrist, Psychologist, nurses) including my mental health counselor, Kelvin McCoy, and the facility physician, Dr. Raymond Moody. I always talked about my physical ailments of nausea, dizziness, acid reflux, headaches and vomiting, which I believed to be a result of no longer consuming hormones. I always talked about my depression, anxiety, lethargy and serious preoccupation with genital mutilation and self castration. I always talked about my wrist and arm cutting problem. I begged for help. I sought only the necessary forms of care.

On 8/5/13 I filed a grievance (which was later rejected by the Warden; then I filed an appeal to Central Office). On 8/9/13 Mr. McCoy told me that Drs. Billy Nichols and Sharon Lewis made the decision not to permit me to be treated for GID. Their decision was based upon S.O.P. VH47-0006; a policy which makes arbitrary distinctions between transsexuals that have been treated prior to incarceration and transsexuals that have not. The policy is a "maintenance" policy that refuses care to the later. No sound medical judgement was employed in the decision-making process because no action had been taken to determine the severity of my condition and my needs.

On 8/15/13 Dr. Moody told me that he had been in communication with Drs. Nichols and Lewis, and it was their decision pursuant to S.O.P. VH47-0006 not to

Complaint Continued

provide me any treatment. He advised me that he could do nothing and that I should raise the issue with Drs. Nichols and Lewis.

On 8/20/13 I wrote a 4-page letter to both Dr. Lewis and Dr. Nichols. My letters beseeched them to provide care, to atleast make their decision based upon sound medical judgement rather then policy. A month later I wrote Drs. Lewis and Nichols again on 9/25/13 During this one month period I spoke with mental health staff and medical staff. Also, my grievance and subsequent appeals were active at this time.

I sought assistance, care and treatment for my Gender Identity Disorder, and was even reviewed due to my high-risk for genital mutilation, self-harm and suicide attempts. Mental Health Counselor DeWese and psychologist Dr. Harrison attempted to argue on my behalf (and also tried to be supportive although their hands were tied) as had my previous Mental Health Counselor Mr. McCoy but to no avail. I was then advised of some legal options that were available to me and offered their continued concern and support.

My grievance appeal's response was due within 100 days, or by February 6, 2014. No response ever reached my general counselor, Mr. Humphries, or me. I was denied all care, but specifically hormone therapy. The Defendant's Dr. Nichols and Dr. Lewis permitted and maintained a policy that was discordant and out of harmony with published professional

standards of care, i.e., the Harry Benjamin Standards of Care published by the World Professional Association for Transgender Health. The Defendants' disregarded my needs and disregarded degrees of contemporary care with callous and deliberate indifference; not even bothering with the pretense of caring or offering a less effective remedy. Point blank, my condition was so insignificant to them they didn't even bother with precursory evaluation of my condition or its severity.

And due to their actions or lack thereof, and their failure to treat me, I have suffered through self-mutilation of my wrist, arm, thigh and genitals; severe depression, insomnia, increased manic-anxiety and psychological breakdowns. My sense of self-loathing and desired to depart from my facial hair (and other male characteristics) have increased immeasurably.

All I want is to be treated! To begin steps, again, to leave this disgusting shell behind. I don't want to be punished like this, tortured. I just can't understand it and I need improvement, need release, no matter the cost.

## COUNT I

The Defendants acted with deliberate indifference to the serious medical needs of the Plaintiff by basing their refusal to provide care upon policy instead of sound medical judgement in violation of the Eighth Amendment.

## COUNT II

The Defendants acted with deliberate indifference to the serious medical needs of the Plaintiff by refusing to provide any treatment for the Plaintiff's GID, which caused unnecessary, prolonged and wanton infliction of physical and mental anguishes, constituting cruel and unusual punishment under the Eigth Amendment.

## COUNT III

The Defendants acted with deliberate indifference to Plaintiff's serious medical need because their actions were so inadequate to properly treat GID; and was vastly divergent from the professional standards (known as the "Harry Benjamin Standards of Care") maintained

and employed by health care professionals world wide.

## COUNT IV

The Defendants' acted with deliberate indifference by failing to provide adequate, standard-meeting care in violation of O.C.G.A. § 42-4-5

## COUNT V

The Defendants acted with deliberate indifference by failing to provide adequate, standard-meeting care in violation of the Declaration of Human Rights (Articles 5 and 25).

## COUNT VI

The Defendants acted with deliberate indifference to the Plaintiff's serious medical needs by maintaining and employing a policy which made arbitrary distinctions and denied care on the basis that care hadn't been provided by a physician prior to Plaintiff's incarceration.

# COUNT VII

The Defendants violated the Plaintiff's right to be free of discrimination under the Equal Protection Clause by refusing to provide treatment for transsexual inmates who had not been treated prior to incarceration but treating ~~inmates~~ inmates with other serious medical conditions regardless of their treatment history.

**11.** List the name and address of every person you believe was a witness to the incident(s) you complain about, BRIEFLY stating what you believe each person knows from having seen or heard what happened. (USE ADDITIONAL SHEETS, IF NECESSARY)

Dr. Harrison

Ms. DeWeese

Melvin McCoy

Randy Ollie Toole, Jr.

**12.** BRIEFLY state exactly what you want the court to do for you. That is, what kind of relief are you seeking in this lawsuit? Do not make any legal arguments and do not cite any cases or statutes! (USE ADDITIONAL SHEETS, IF NECESSARY)

Wherefore, Plaintiff respectfully asks this Court to enter judgement in favor of the Plaintiff, granting:

a) A declaration that the acts and omissions described herein violated Plaintiff's rights under State law and the Constitution of the United States

b) A preliminary and permanent injunction ordering the defendants to prescribe and provide gender-affirming therapies, such as hormone therapy, for the Plaintiff, (\* ATTACHMENT)

**13.** You may attach additional pages if you wish to make any legal argument. However, legal arguments are NOT required in order for you to obtain relief under §1983. If the court desires legal argument from you, it will request it. If any defendant presents a legal argument, you <u>will</u> be afforded an opportunity to respond thereto.

**14.** KEEP IN MIND THAT ONCE YOUR LAWSUIT IS FILED, THE COURT WILL REQUIRE YOU TO <u>DILIGENTLY</u> PROSECUTE IT. That means that you will be required to go forward with your case without delay. Thus, if you fail to adequately prepare your case <u>before</u> you file it, you may find your lawsuit dismissed for failure to prosecute if you take no action once it is filed. YOU WILL RECEIVE NO FURTHER INSTRUCTIONS FROM THE COURT TELLING YOU WHAT TO DO OR HOW TO DO IT! IT IS YOUR RESPONSIBILITY AND YOURS ALONE TO PROSECUTE YOUR OWN CASE! If you fail to prosecute your case, it will be dismissed under Rule 41 of the *Federal Rules of Civil Procedure.*

Signed this 17 day of February, 20 14.

_____
PLAINTIFF

Relief Continued...

and psychotherapy; instructing the policy discontinued.

c) Compensatory damages in the amount of $10,000 against each defendant, jointly and severally.

d) Punitive damages in the amount of $100,000 against each defendant, jointly and severally.

e) A jury trial on all issues triable by a jury

f) Counsel to represent Plaintiff in this matter

g) Plaintiff's costs in this suit; treatment by a therapist

h) Any additional relief this Court deems just.

i) Individual evaluation by a psychologist and physician from outside the prison system to determine my needs and set a necessary treatment plan; as soon as practical so that I may recieve the minimum but necessary primary and secondary treatment

j) electrolysis treatment as under Kosilek v. Spencer

| VI. Problems<br>Goals<br>Intervention Strategies | Name: Lynch, Christopher<br>ID#: 1000768589 |
| --- | --- |

Problem #: _1_ Problem Description: Significant distress associated with incongruence between natal gender and experienced gender / persistent desire to be rid of male sexual characteristics with pre-incarceration intervention (self-administered hormone therapy and surgical alteration 2° characteristics)

Goal: [ ] Maintenance   [ ] Change { [ ] Stabilization   [ ] Transition  [X] Adaptation}
Goal Description:
Offender will maintain stability AEB appropriate functioning -adls and satisfactory performance on work details, absence of disciplinary sanctions,

| Start Date: 10-18-13 | Target Date: 10-18-14 | Achieved: | Changed: |
| --- | --- | --- | --- |

Intervention Strategy (Include relevant strengths & weakness, action to be taken, frequency of sessions, and person responsible):
Offender is unable to pursue gender preference / sexual reassignment surgery & hormone treatment due to institutional policy and is at increased risk of harm in general population due to identifying as opposite gender. Supportive counseling for associated dysphoria incl anxiety and depressed mood, MHC meeting q 30 days, Psychology as determined by provider

Problem #: _2_ Problem Description:

Goal: [ ] Maintenance   [ ] Change { [ ] Stabilization   [ ] Transition  [ ] Adaptation}
Goal Description:

| Start Date: | Target Date: | Achieved: | Changed: |
| --- | --- | --- | --- |

Intervention Strategy: (Include relevant strengths & weakness, action to be taken, frequency of sessions, and person responsible):

GEORGIA DEPARTMENT OF CORRECTIONS
MH/MR Diagnosis List

Institution: **VALDOSTA STATE PRISON**
Name: *Lynch Christopher*
ID #: *1000 768 589*
Date: *10/18/13*
Race: *W*    Sex: *M*

DIAGNOSIS:

Primary: *302.85 Gender Identity D/O, Sexually Attracted to Males*    [] Axis I   [] Axis II
*(Primary Diagnosis must also be entered on the Medical Problem List (Medical Record-Section I.)*

Secondary: *301.9 Personality D/O NOS (multiple traits)*    [✓] Axis I   [✓] Axis II

Additional: *304.80 Polysubstance Dependence*    [✓] Axis I   [] Axis II

Additional: _____    [] Axis I   [] Axis II

Axis III: *√ 70.50*
*(List general medical conditions that are potentially relevant to the understanding or management of the inmate's mental disorder.)*

[ ] History of substance abuse or dependence.
[ ] History of being the victim of physical and/or sexual abuse. [✓] Clinically relevant. [ ] Not clinically relevant.

DSM-IV CRITERIA FOR THE PRIMARY DIAGNOSIS:

*Desire to live as the other sex, persistent discomfort & sense of inappropriateness in gender role & rule, preoccupation with ridding self of sexual characteristics of male, significant distress & impairment in multiple areas of functioning*

Anticipated Duration of Treatment/Caseload Placement: [] <6 months  [] 6-12 months  [✓] 12 months

Level of Care when Diagnosis made: [] Level 1  [✓] Level 2  [] Level 3  [] Level 4  [] Level 5  [] Level 6

SIGNATURES: Signing affirms your role in the provision of mental health care. Fill out new Diagnostic List to Change/Add to Diagnosis.

| Primary MH/MR Care Provider | | | | | Clinical Supervisor | | |
|---|---|---|---|---|---|---|---|
| Signature | Print Last Name | Date | Level | Date | Signature | Print Last Name | Date |
| *DBW LPC* | *DeWeese* | *10-18-13* | *2* | | *WM BM W* | *Dudenson* | *11/5/13* |
| | | | | | | | |
| | | | | | | | |

| Psychiatrist / CNS | | | Psychiatrist / CNS | | |
|---|---|---|---|---|---|
| Signature | Printed Last Name | Date | Signature | Printed Last Name | Date |
| *C Brown APRN* | *Brown* | *10/31/13* | | | |
| | | | | | |
| | | | | | |

## Keep On Top of MH/MR Record – Section 2

Date: 10/18/13

## I. Psychiatric Diagnosis (DSM-IV):

Primary Diagnosis: 302.85 Gender Identity Disorder, sexually attracted to males (Axis I [✓] Axis II [ ])

Other Axis I: 304.80 Polysubstance Dependence

Other Axis II: 301.9 Personality DDO NOS (multiple traits)

Axis III: V 70.50

*(List general medical conditions that are potentially relevant to the understanding or management of the inmate's mental disorder.)*

History of being a victim of physical/sexual abuse [✓] yes [ ] no. If yes, clinically significant [✓] yes [ ] no.

## II. Discharge Criteria/Planning (List criteria that, when met, will allow the inmate's discharge from mental health):
- treatment plan goals met
- absence of serious & persistent mental illness
- without psychotropics ≥ 60 days
- without recent crisis placement

## III. Precautions (List any medical, security, management, etc., precautions staff needs to take in the treatment/management of this inmate/probationer.): STANDARD, ALSO REQUIRES secure HOUSING DUE to identifying as opposite sex

## IV. Level of Care: [✓] Level II     [ ] Level III     [ ] Level IV

## V. Signatures: To sign up type up (on Tier, status)

| | | |
|---|---|---|
| Inmate's/Probationer's Signature | Date 10-18-13 | DONNA DEWEESE LPC MH COUNSELOR |
| Primary Service Provider Signature/Title | Date 11/5/13 | Printed/Typed Name Deweese DV |
| Clinical Supervisor Signature/Title | Date 10/21/13 | Printed/Typed Name Brown |
| C. Brown RN CNS/MH Psychiatrist Signature/Title | Date | Printed/Typed Name |

Due Date of Next Review: 4/18/14  R



**W**HEN COY MATHIS WAS A YEAR and a half old, he loved nothing more than playing dress-up. He didn't show much interest in the fireman costume or the knight outfit, but would rummage through the toy box to grab the princess dress with the flowery headpiece. His mother, Kathryn, would text photos to her husband of their plump-cheeked blond boy twirling in a pair of pink-and-purple butterfly wings or wearing a frilly tutu.

*Cute,* Jeremy Mathis would text back. A former Marine who was attending college in Colorado Springs, Colorado, Jeremy agreed with his wife that Coy's fascination with all things sparkly, ruffly and pink was the harmless play of a toddler whose mind was yet untouched by social constructs of "masculine" and "feminine." Coy was one of four siblings – a triplet with a same-age sister and brother, plus an older sister – and so was surrounded by both "girl" and "boy" toys, inside their cramped split-level house, where the living room was covered by a patina of puzzle pieces and stray Legos. Kathryn and Jeremy figured it was just a matter of time before Coy sorted it out for himself.

As Coy hit the terrible twos, though, his preference for all things girly became more insistent. He refused to eat unless his food was served on a pink plate, with pink utensils. He rejected the Matchbox cars and Iron Man figurines his parents gave him for Christmas, telling his brother, Max, "This is for you." And at every opportunity Coy would wriggle out of his jeans and T-shirts and reappear in his sister's dress or, when he could get his hands on it, her *Dora the Explorer* bathing suit. His parents made concessions to pacify Coy, including letting him remain dressed in girl clothes, but only in the privacy of their home. Living, as the Mathises did, close to five military installations, as well as near the headquarters of the far-right evangelical advocacy group Focus on the Family – and not far from New Life, the 10,000-member megachurch founded by Ted Haggard – Kathryn and Jeremy figured their conservative neighbors might not see Coy's playful cross-dressing as benignly as they did.

"It's a phase," the Mathises reassured each other. Kathryn, however, wondered if it could be something more. She'd noticed the way Coy brightened whenever he put on a dress or a fairy costume. She wondered whether their toddler might be gay. The notion sat fine with her: The Mathises were recent transplants from Austin and considered themselves progressive and open-minded; Kathryn herself had a gay sister. But she told no one of her suspicion about Coy – it felt creepily premature to speculate about the sexuality of a kid still in diapers.

Then one night in January 2010, Kathryn was tucking him in for bed under his pink quilt, and Coy, then three, seemed upset. "What's wrong?" she asked. Coy, his head resting against his kitty-cat-print pillow, hugged his pink stuffed pony with the glittery mane that he'd gotten for Christmas and said nothing, his mouth bent in a tight frown. "Tell me," Kathryn urged. Coy's chin began to quiver.

"When am I going to get my girl parts?" he asked softly.

"What do you mean?"

"When are we going to go to the doctor to have me fixed?" Coy asked, tears now spilling down his cheeks. "To get my girl parts?" That's when it dawned on Kathryn Mathis, with a sinking feeling, that she and Jeremy were dealing with a different issue altogether.

> **"When are we going to go to the doctor to have me fixed?" Coy asked his mother at the age of three. "To get my girl parts?"**

**T**HUS BEGAN THE journey that would lead the Mathis family to perform a radical social experiment, put them on a collision course with their local school district in Focus on the Family's backyard and transform Coy Mathis into the transgender movement's youngest icon – setting the stage for a showdown in the very capital of the American religious right.

Building upon the gains of LGB activists, the trans-rights movement is having its moment, advancing more swiftly than even its advocates ever imagined. This past May, the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* was updated to replace its old classification for trans people, "gender identity disorder," with "gender dysphoria," reflecting the new understanding that having a gender identity that doesn't match your birth anatomy doesn't make you mentally ill; only any associated distress is considered a problem. The diagnostic change was greeted within the tiny trans community – gender dysphoria is thought to affect as many as one in 10,000 people – as momentous a turning point as the *DSM*'s 1973 declassification of homosexuality had been for gays. The increasing acceptance also sparked a new awareness of how early in life some people begin to realize they may have been born in the wrong bodies.

"One kid in my practice tried to cut off their penis with a pair of scissors at five," says pediatrician Johanna Olson, who is the director of the country's largest clinic for gender-nonconforming kids, the Center for Transyouth Health and Development at Children's Hospital Los Angeles. "It happens more often than you might think."

If the trans movement is the LGBT's final frontier, then transgender youth represents its farthest outpost. Kids are coming out as trans earlier than ever: A survey of the San Francisco school district found that 1.6 percent of high school students and, incredibly, one percent of middle-school students identified as transgender. Children are packing the few U.S. clinics like Olson's, which are at the forefront of a new therapeutic approach, in which children may live as their preferred gender, complete with appropriate clothing, pronouns and often a new name. This so-called affirmative model has found an increasingly warm reception among the worried parents of trans children. And so while most doctors still consider this "social transition" for kids under the age of 10

SABRINA RUBIN ERDELY *wrote about the heirs to the Duke fortune in RS 1189.*

to be controversial, already these intrepid young pioneers have begun venturing out into the world – including, in rare cases, female-to-male trans kids who undergo "top surgery" as early as age 13.

As such, the trans-rights movement has speedily moved to a brand-new battleground: public schools. Although 623 American colleges and universities have already adopted nondiscrimination policies to cover gender expression, high schools and middle schools are being forced to grapple with the question of how to deal with trans students in their locker rooms, athletic fields and bathrooms. It's a haphazard fight raging at district, county and state levels; thus far, 2013 has been what appears to be a watershed year. This past winter, educators in Massachusetts, Maine and Portland, Oregon, issued guidelines to accommodate trans students, allowing them to use bathrooms and play on sports teams corresponding to the gender with which they identify. But in August, California trumped them all by becoming the first state to pass legislation spelling out that transgender students can choose which bathrooms, locker rooms and sports teams they wish, based on their gender identity.

The national headlines have inspired debate over whether this is a laudable move to recognize the needs of trans kids – or a wrongheaded manifestation of overindulgent parenting. After all, what does a child really know about authentic identity, or about what's best for them? However, any reasonable discussion on the subject has been drowned out by conservative Republicans, who have staked out a position that is reflexively anti-trans. "Is that not the craziest thing you've ever heard?" Mike Huckabee asked at October's right-wing Values Voter Summit, speaking of California's anti-discrimination-schools law; California Republicans have already targeted its repeal as a top priority. Earlier this year, House Republicans tried to strip the Violence Against Women Act of its protections for transgender women, and Arizona state Rep. John Kavanagh introduced a bill that would have made it a crime for trans people to use their preferred bathrooms. Fox News commentators vehemently oppose any accommodation of trans kids in schools, something Bill O'Reilly calls "anarchy and madness."

Perhaps no one is more outraged, however, than the religious right, of which Focus on the Family reigns as a dominant force. On Focus' 81-acre Colorado Springs

campus, some 600 employees put a chunk of their $90 million annual budget to work creating LGBT intolerance on every front, including fighting "safe-school" anti-bullying initiatives and pushing reparative therapy. Leading Focus' charge to push people back into the closet is its "gender-issues analyst" Jeff Johnston, himself a proud "ex-gay" – now a married father of three boys



**Girl, Interrupted**
At age two, Coy insisted on wearing girls' clothes, refused to eat unless she had pink utensils and rejected Matchbox cars and Iron Man figures, telling her brother, Max, "This is for you."

– who blames what he calls the "sexual brokenness" of LGBT people on a combination of poor parenting, molestation and original sin. In his newsletters for Focus, Johnston treats trans people in particular with amused pity. "Male and female are categories of existence," he wrote this year. "It is dehumanizing to categorize individuals by the ever-proliferating alphabet of identities based on sexual attractions or behavior or 'gender identity' – LGBBTTQQIAAFP-PBDSM – however many letters are added. No. We stand with the truth."

And yet despite all the opposition, the movement toward early transition continues forward, driven largely by a school of thought within the medical community based around the idea of harm prevention.

Indeed, studies show that the threat to transgender people is very real: One study showed more than half report being bullied in school; 61 percent are physically assaulted; 64 percent are sexually assaulted. Trans people have sky-high rates of unemployment, homelessness, substance abuse and suicide: Forty-one percent of transgender people attempt suicide, with trans teenagers the highest at-risk group. Given those staggering odds, many clinicians are anxious to try something – anything – that might mitigate that harm.

"Kids that are supported from early childhood look very different from kids that come in here at 18," Olson says of her practice of 250 children and young adults. "The kids who come in at 18, 19, 20 are highly traumatized." How differently would they have turned out, she wonders, if instead of enduring years of conflict and rejection, they'd been met with support?

T THREE AND A half, Coy turned sullen. He'd spend days on the couch, wrapped in the fuzzy pink security blanket he'd commandeered from his sister. He didn't want to play, or talk. He especially didn't want to go outside; any enthusiasm Coy might show for a trip to the playground would disappear as soon as he'd catch sight of the boys' clothes he was expected to swap for the dresses he wore at home. The only thing Coy hated more was the prospect of getting a haircut; the last time his parents had suggested it, Coy had taken to his bed for days, listless and tearful.

"It was like what you see on commercials for severely depressed people," remembers Kathryn, a slender woman of 27. Her career as a photographer took a back seat to motherhood after the couple's assisted efforts to have a second child had yielded unexpected triplets. Little by little, Kathryn began letting Coy leave home dressed in a pink shirt – anything to pry him from the house with minimal fuss – and soon enough, with pink sneakers to match. Jeremy drew the line at letting Coy wear colorful hair clips outdoors. "I was trying to avoid a negative experience," recalls Jeremy, who is even-tempered and stocky with rimless glasses. "Someone going, 'Why are you dressing your son up as a girl?'"

On her online parenting message boards, Kathryn asked for advice. A transgender parent volunteered that Coy's behavior sounded awfully familiar. "I knew

KATHRYN MATHIS





**Modern Family**
The Mathises are no strangers to complication. Eldest daughter Dakota (on stairs) is autistic, and Coy's fellow triplet Lily was left with brain damage from meningitis. They tried to deal with Coy's gender confusion by keeping an open mind.

when I was two or three," he wrote, a line that resonated with Kathryn. She thought about the fact that Coy hadn't wanted to be seen naked since age two, oddly modest while his siblings pranced around oblivious to their own nudity. She thought about the disappointment on Coy's face when he asked her, "I'm a girl – why are you calling me 'he'?"

Kathryn broached the subject with her husband. "Coy is saying, 'I don't want to have a beard.' Maybe he's – transgender or something?" she asked, testing the word.

"Yeah," Jeremy considered. "Probably." It made so much sense that they barely discussed it further – and yet the implications felt so huge that for a moment Jeremy was overwhelmed. Their household was already bursting with complications. Jeremy had bounced around jobs after his military stint had been cut short: He'd been discharged from the Marines not long after basic training for a hip injury severe enough that when he'd tried to re-enlist after 9/11, they wouldn't take him. Two of their children were special-needs: Their oldest, six-year-old Dakota, was autistic, and one of the triplets, Lily, had been left severely brain-damaged by a bout of viral meningitis as an infant. The Mathises had also just had another baby, a girl named Auri – their fifth child. Taken in perspective, Coy's gender confusion was

hardly their most urgent family matter. The Mathises resolved to deal with it the way they dealt with everything: by staying calm, tackling one crisis at a time, and keeping an open mind.

At Coy's wellness visit with his pediatrician, the Mathises lightly brought up his gender issues. Not long ago, the dogma on how to treat such children was to urge them toward conformity – a treatment model paralleling the now-discredited "reparative therapy" aimed at "curing" homosexuals. The American Psychological Association and the American Academy of Pediatrics have rejected the forced-conformity approach for gender-dysphoric patients, saying that not only are such efforts doomed to fail but that, says the American Psychoanalytic Association, they "often result in substantial psychological pain."

But despite having jettisoned the old model, few health professionals are comfortable urging parents to let their preschooler pose as a different gender. There is not yet a standard screening model to separate the small percentage of truly trans

kids from the merely gender-variant (though studies suggest that extreme dysphoria in early childhood can be a predictor of transgenderism). But gender nonconformity doesn't necessarily mean that the kid will turn out transgender: A 2012 Harvard School of Public Health study found that 85 percent of children who expressed some form of gender nonconformity actually grew up to not be LGB or T, but *straight*.

Lacking hard data and facing so much uncertainty, practitioners are eagerly awaiting an American Psychological Association committee's expected release of guidelines in 2014. In the meantime, clinicians refer to the standards of care set by the World Professional Association for Transgender Health, which advocates the cautious but loving approach that Coy's pediatrician suggested, known as "wait and see." The Mathises were told to hold off on decision-making and to simply express support for Coy and his choices, follow his lead and see where it might take them.

The next time Coy begged to wear barrettes in his shaggy hair while they ran errands together, Jeremy cringed but relented. At the store, an older woman looked at father and son for a long moment, then approached. Jeremy braced himself.

"You have a pretty baby girl," the woman cooed.

Jeremy blinked. "Thanks!" he practically shouted with relief. He looked down at Coy, who beamed with pride.

For the next year and a half, while his parents indulged his desires, Coy returned to the happy, playful child he'd once been, smiling as he romped around the backyard with a giant Minnie Mouse-style hair bow atop his head. They let him wear whatever frilly thing he wanted, gave him a Barbie, honored his wish to paint his bedroom pink and, although they continued calling him "he," Coy seemed satisfied. His parents were thrilled. In 2011 they signed Coy up for half-day kindergarten right on schedule at the local public school, Eagleside Elementary, a sprawling building of tan-and-maroon brick, with the bland, spare look of an office park. On Coy's registration form, under "gender," they checked "boy."

THEIR PROBLEMS BEGAN almost immediately.

"I don't wanna wear this!" Coy would protest of the boys' pink polo shirts his parents had thought a fair compromise; sending their boy to kindergarten dressed in girls' clothing was out of the question. "You can wear whatever you want when you're not in school," they told him, in voices patient but firm. "But these are appropriate clothes for school." Coy was miserable. In class he was anxious, tearful, unable to focus and made few friends. At the end of each three-hour day he'd trudge out of school crying because some classmate had referred to him as a boy. The moment Coy got home, he'd strip off his clothes as though they were suffocating him, right down to the pink underwear his parents let him wear as a consolation, and put on a dress to relax.

One day in mid-November, Coy's kindergarten teacher pulled Jeremy aside at pickup time to say there'd been an incident: That morning, they'd divided the kindergartners into two lines, boys and girls – and Coy had lined up with the girls. "You're a boy," the teacher had corrected. Coy had sobbed for the rest of the day.

At home afterward, Coy remained inconsolable. "Even my teacher doesn't know I'm a girl!" he wailed, retreating to his bedroom to curl up with his pink blankie.

Something needed to be done; Kathryn and Jeremy recognized they couldn't continue onward like this. The "wait and see" approach had made sense in theory. But as Coy got older, they began to realize there was no middle ground. When it came to gender, they would have to choose one or the other, pink or blue. It also struck them that, by allowing Coy to be a girl at home and forcing him to be a boy at school, they had effectively helped their child to carve out a closeted double life. "We were thinking, 'If we give you a safe space to be who you are, that's our way of being supportive,'" recalls Kathryn. "But we were really sending the opposite message: It's not safe, but we'll give you a place to hide." They were ready for a new approach. Coy had long since made his choice; it was time to fall into line behind him. "This whole wishy-washy 'What are we doing?' That was done," says Jeremy.

With the help of the support group TransYouth Family Allies, the Mathises met with a psychologist in Boulder, Colorado, who noted that Coy met the criteria for gender dysphoria: He insisted he was the opposite gender; he was persistent about it over a protracted time period; and the incongruity was causing him distress. Now that Coy had an official diagnosis, their next step was clear. And so it was that, in December 2011, Coy showed up for kindergarten in a rainbow dress and pink leggings, chin-length blond hair held back with barrettes, and a baby-toothed smile – no longer a "he" but a "she."



WITH THE WATTage on her personality dialed back up, Coy Mathis proved a popular little girl. At recess she and the other kindergarten girls played Mommies with their baby dolls, and at pickup time her friends would call out her name and wave elaborate goodbyes. There had been some questions at first. "I thought you were a boy," some children asked her. "No, I'm a girl," Coy answered, which satisfied most kids; they appeared to accept the gender switch as normal. Only one kid, a girl, seemed perturbed. "You're not a girl – you're a boy!" she'd insist day after day, upsetting Coy so much that Kathryn finally asked the teacher to move the other child's seat to a different part of the classroom.

Reactions among the kindergarten parents were harder to gauge. No one said anything rude, but Jeremy and Kathryn noticed that fewer parents engaged them in small talk and some gave them a wide berth. Kathryn was heartened by the handful of people who approached asking how they might explain Coy's situation to their own five-year-olds. The bluntness of her answer may have taken them aback: "The best way to explain it is, no bodies are the same. Some girls have penises and some boys have vulvas." She was politely thanked for her advice.

Surely, the community's mostly gracious reaction had much to do with the tone set by Eagleside Elementary's administration, whose support had surprised the Mathises. When, after their visit to the psychologist, Kathryn had e-mailed Eagleside asking for a meeting "regarding Coy and the whole boy-girl thing," she and Jeremy had been unsure of what sort of reception they'd get. After all, one of the town's chief exports was the vociferous opposition to any laws favoring gay or transgender rights. When, in 2008, a proposal had passed in the Colorado legislature to expand the state's anti-discrimination law to protect people based on sexual orientation, including trans people, Focus on the Family had lobbied for its veto, warning that the law would expose women and children to dangerous perverts who would now freely lurk in public restrooms. Throughout the state, Focus ran a radio scare ad titled "Predator," which specifically cited the threat of trans people in schools. "If the Colorado legislature has its way, we could all be dealing with a new type of predator," warned the announcer. "And instead of our kids worrying about class work, they'll be worrying about who might be in the restroom with them."

The proposal had passed anyway, making Colorado one of 17 states that now prohibits discrimination on the basis of gender expression. Kathryn and Jeremy discovered the law's existence while doing research in preparation for their sit-down with Eagleside administrators and, on the day of the meeting, had arrived armed with a printout of the particulars. They'd been pleased to discover that the four staffers, including the school principal, had shown up with a copy of the state law too.

"They asked what they could do to help," remembers Kathryn. "The school psychologist was just giddy." As a result, Coy's transition had gone so smoothly that by the end of kindergarten and into first grade, she was thriving: happy, succeeding in school and coming home with her backpack full of birthday-party invitations.

So the Mathises were unprepared when, one night in December 2012, they got a call at home from Principal Jason Crow. "Hey,"

"The school is being mean to me," Coy said after being pulled out of first grade. "They're telling me I'm a boy when I'm really a girl."

he said casually, "we have to have a meeting soon about Coy." He informed them that Coy would no longer be permitted to use the girls' bathroom. Kathryn and Jeremy were stunned. "I started ranting and raving," Kathryn says, "and then I went into action. I looked up the law to make sure nothing had changed, and it hadn't." The school had never reported any problems with Coy's gender status before; the Mathises couldn't imagine what had triggered the sudden policy switch.

But unbeknownst to the Mathises, a debate had been brewing for months. Unlike kindergartners, who had a gender-neutral bathroom in their classroom, first-graders used the boys' and girls' bathrooms down the hall. Some parents were already touchy about Coy; one mom had complained to Crow about her "moral issues" with Coy's upbringing – how would they react to Coy using the girls' room? As later explained in legal documents, the superintendent of the Fountain-Fort Carson school district was concerned about the precedent Coy's access to the girls' bathroom would set.

"The district also had to take into consideration that this would not be an isolated request, and that it was probable that it would be faced with one or more requests in the future," the superintendent wrote. "And perhaps by a student much older and more physically mature than Coy." The terrifying prospect of this hypothetical older, maturer student was key to their analysis. As attorney William Kelly Dude would write in the accompanying position paper, while perhaps it seemed acceptable for a harmless six-year-old like Coy to enter the girls' room, he vividly described what a future infiltrator could look like: "a male high school student with a lower voice, chest hair and with more physically mature sex organs who claims to be transgender and demands to use the girls' restroom" – a menacing portrait of an impostor that echoed the threat of Focus on the Family's "Predator" ad. That hairy deviant would soon be Coy herself, as Dude would write the Mathises: "As Coy grows older and his male genitals develop…at least some parents and students are likely to become uncomfortable with his continued use of the girls' restroom." The decision had come down swiftly: For the protection of the district as a whole, Coy was to be banned from the girls' restroom.

"You know this is against the law, right?" Kathryn demanded of Principal Crow in his office a couple of days after his phone call. This wasn't just about finding Coy a toilet. It was about the larger message Coy would be forced to internalize every time she had to relieve herself: that she was abnormal, that there was something so grotesque or unsafe about her that her very presence in a place as delicate as a bathroom was intolerable. And Coy wouldn't be the only one digesting that attitude; so, too, would her peers.

"There's nothing I can do," Crow, a tall, soft-spoken man with dark, slicked-back hair, told Kathryn. "My hands are tied."

"Then the kids aren't coming back to school," Kathryn snapped, storming out of his office. The Mathises were bewildered to realize that the protections they'd thought Coy had by law didn't seem to protect her at all in reality – and they worried about what that gap might mean for the rest of Coy's life. "If we just back down, then it's going to be a fight again in middle school, and in high school, and again in college," Kathryn says. "But if we can get the big fight over with to make sure these places know they have to follow the law, then maybe we won't have to do it forever."

The Mathises filed a discrimination complaint with the Colorado Division of Civil Rights. They withdrew Coy and her siblings from school, explaining to the kids that the school wasn't being very nice right now and that Mommy was going to be their teacher for a while. Coy understood. "The school is being mean to me," she said. "They're telling me I'm a boy when I'm really a girl." With that, the Mathises were ready to take the next affirmative step.

O N A B A N Q U E T T E in the lobby of the Hampton Inn in Philadelphia, on the eve of the Trans-Health Conference, the moms are drinking wine. "My mother says, 'What does she want for Christmas?'" says Kristine Janovitz, speaking of her 12-year-old trans daughter. "I said, 'A vagina!'"

Everyone around the table roars with appreciative laughter, including Kathryn Mathis, who looks shyly down at the table. Kathryn could never be so open with her own conservative, religious Texan family, with whom she'd had an arms-length relationship anyway. Though she's sure some of her family objects to Coy's living as a girl, they know better than to articulate their disapproval because, says Kathryn, "if they were to be outspoken about their problems with Coy, they would be cut off." Perhaps with that in mind, both Kathryn's and Jeremy's families responded quite well upon being told that Coy would be raised as a girl. "Well, I figured," Jeremy's father had remarked dryly, "'cause he's wearing a dress in all the pictures on Facebook."

Absent much family support, the Mathises have built a new community for themselves by connecting online with other parents of trans kids. Their efforts have been made easier by the fact that their discrimination complaint made Coy an overnight LGBT luminary, her story splashed in the pages of *The New York Times* and on Katie Couric's show. Over the past few months, Coy has stayed up well past her bedtime to appear at the red-carpet GLAAD awards and at a trans-rights fundraiser, events where strangers flocked to the Mathises to thank them, and share their own stories of discrimination. Jeremy has been so horrified to learn about the difficulties trans people routinely face – in the workforce, getting health insurance, in the housing market, and don't even get him started on incarcerated trans people – that he is about to begin law school, determined to become a civil rights lawyer. For Kathryn and Jeremy, their swift rebirth into champions of an underdog cause has imbued their lives with a new sense of forward motion. Thus, in a short time period, necessity and now passion have turned the Mathises into a couple invested enough in trans issues to have packed all five kids into their enormous wheelchair-accessible van for the two-and-a-half-day drive here to the annual Trans-Health Conference, on what amounts to their first family vacation.

As the hotel fills with families checking in, the lobby takes on the gushy feel of a reunion, with parents whooping as they greet one another and proudly introduce their kids, who are running everywhere. "I have three girls: two biological, one trans," one mom says to another by way of introduction. The most striking thing about the crowd is their ordinariness: just a bunch of earnest suburban moms and dads, accompanied by young children still so androgynous-looking that the trans kids are indistinguishable from their non-trans siblings.

Coy races by, shrieking with glee while getting a piggyback ride from an older kid. This evening Coy is wearing a mint-green

> The ruling in Coy's favor is the nation's very first to uphold the rights of trans students and is being viewed as a landmark case.

dress with a butterfly print, pink leggings and pink patent-leather shoes, her baby-fine golden wavy hair pinned back with two sparkly flower barrettes. As she shows off by carefully balancing a dime on the tip of her dainty ballet flat – "Look what I can do!" she squeals, then wrinkles her brow to better concentrate on lifting her pointed toe an inch higher – it seems impossible to imagine that she is anything but a girl.

But with older trans kids tearing about the conference, the Mathises get a glimpse of how puberty will change everything for Coy, and that's a major reason why they are here in Philadelphia: for the camaraderie, yes, and for present-day guidance, but mostly to start amassing information on what Coy's future might hold.

The prevailing train of thought from the affirmative camp goes like so: If these kids are truly trans, why should they endure the horrific transformation of developing the "wrong" adolescent body in puberty – a trans girl with an Adam's apple and a low voice; a trans boy coping with breasts and a monthly period – with all the wrenching emotional consequences, only to have to medically undo those changes later in life, with less-than-ideal results? Rather, a few clinics have adopted a series of medical interventions to delay puberty and then, later, give kids a smoother gender reassignment. The first step, sometimes as early as age nine, is medications called puberty blockers, which stave off secondary sex characteristics, buying families precious decision-making time until they feel sure of the child's wishes. Though concerns remain about whether kids on puberty blockers develop adequate bone density, pediatrician Olson says blockers are an effective low-risk tool when used for the short term: "The blockers allow us to push the pause button and let kids explore gender during what are really the most difficult years," adding that if kids ultimately decide not to continue the regimen, they could simply stop taking the meds, and anatomical puberty begins.

Assuming the kid is still insistent, though, step two begins in adolescence: With the child's prepubescent body a relative hormonal blank slate, cross-sex hormones are introduced, so that the child's body blossoms into his or her preferred gender – resulting in a gender reassignment with far more convincing-looking results than for those who transition as adults. Step two is also the point at which there's no turning back, since once a child's voice drops, or there's significant breast development, those changes will remain even if they come off the drugs. And then, eventually, there's step three: "bottom" surgery, if they choose, at age 18 or older.

This path through adolescence can be a frightening prospect even for the most trans-positive parents. If early social transition is about following a gender-fluid child's lead into a possibly temporary experiment, then medical intervention is the point at which parents take charge and decide their child's permanent outcome. Before turning 18, a kid may wish for gender reassignment, but he or she cannot legally go down that path without parental consent; that burden falls on the adults. "Even for the most accepting of parents, it's very much a grief process," says Olson. "You're losing your son and gaining a daughter." And then there's a parent's worst fear: Maybe they're making a colossal, life-altering mistake about their child.

But at the conference over the next few days, the Mathises will witness firsthand the ramifications of *not* taking action, when they survey their fellow attendees swamping the Pennsylvania Convention Center: beefy matrons who call to mind *Mrs. Doubtfire*; delicate men sporting overcompensatory beards; towering divas with fantasy curves; and so many shades of in-between as to make a convention-eer thankful for the name badges listing everyone's "preferred pronoun." The fact that their appearances are confusing even here at the Trans-Health Conference, the most safe and affirming venue on Earth, is a painful reminder that out in the world, these people are not "passing" – few have the privilege of anonymity – and each has to live with the scrutiny that brings.

A child like Coy, however, could have the power to change public perception of trans people. High-profile trans actors like Laverne Cox on *Orange Is the New Black*, or trans teenage characters like Wade "Unique" Adams on *Glee* – and, more controversially, Chelsea (née Bradley) Manning – have brought transgender people a level of visibility they've never before enjoyed. But such spokespeople could never normalize transgenderism in the culture as compellingly as a kid like Coy – whose total inhabitancy of her gender identity is right on the surface, undeniable, as is her guileless wish to be accepted for who she really is.

D AYS  AFTER  THE Mathis family returned home from the convention, in June, they discovered that the Colorado Civil Rights Division had rendered a verdict on their discrimination complaint against Coy's school. Director Steven Chavez had weighed the case and decided resoundingly in Coy's favor, granting her the right to use the girls' restroom, and coming down hard on the Fountain-Fort Carson school district for depriving Coy of her rights. "Telling [Coy] that she must disregard her identity while performing one of the most essential human functions . . . creates an environment that is objectively and subjectively hostile," Chavez wrote in his scathing 14-page ruling, adding that the school's rationale behind forcing Coy to use a different bathroom is "reminiscent of the 'separate but equal' philosophy."

The determination is the nation's very first to effectively uphold the rights of trans students to use the bathrooms reflective of their identities, and is being viewed as a landmark case. "This decision happened in the middle of a cresting wave," says Eliza Byard, executive director of the Gay Lesbian & Straight Education Network. "This case was hugely important to calling attention to the fact that when it comes down to it, schools have an obligation not to discriminate."

Not surprisingly, Focus on the Family's Jeff Johnston expresses disappointment with the ruling. "We don't think it's healthy for girls to be exposed to a boy who thinks he's a girl in a bathroom," Johnston says. And he gently invites the Mathises to seek counseling and stop screwing up their kid. "It's got to be painful to reject your own masculinity. That's painful internal conflict for a child," he reflects. "You want to affirm his essence and the goodness of being a boy – that your masculinity is a good thing, and it comes from God."

The Mathises don't pay such people much mind. "All we ever wanted was for Coy's school to treat her the same as other little girls," says Kathryn. "We are extremely happy with the result." Nevertheless, Coy won't be returning to Eagleside Elementary. The Mathises have moved an hour and a half away to Aurora, where they hope to get a fresh start in the more progressive Denver metropolitan area. The Mathises have been impressed with how receptive Coy's new school district has been in dealing with its first openly trans student, even going so far as to enroll Coy as a girl – in accordance with Coy's new passport, obtained with the help of doctors' letters, which labels her as female – and reassuring the Mathises that no one, other than a few key staffers, would need to know that Coy is transgender. As far as Coy's classmates know, she is just another second-grade girl.

Coy loves her new school. "She already has tons of friends, all girly-girl friends," says Kathryn. Her parents have been cheered by the way Coy has flourished into such a happy little girl – it feels like a signal that they're heading in the right direction. And at her birthday party in September, under the pink and purple Chinese lanterns that hung from the Mathis' living room ceiling, wearing the Wonder Woman outfit Grandma had sent as a gift, Coy stood with wide eyes as her pink kitty-cat cake appeared, topped with a glowing candle shaped like the number seven. She closed her eyes and made a wish. ⊗

November 7, 2013          rollingstone.com | ROLLING STONE | 65