IN THE UNITED STATES
DISTRICT COURT
OF
MIDDLE GEORGIA.

CHRISTOPHER ANDREW LYNCH, MS.D.
plaintiff.
v.
SHARON LEWIS, M.D.,
BILLY NICHOLS, M.D., et. al.
defendants.

PLAINTIFF'S AFFIDAVIT
(STATEMENT OF FACT)

Pursuant to 28 U.S.C. §1746 the above named Affiant hereby certifies, deposes and states under the penalty of perjury that the following facts, set forth herein, are both true and correct to the best of her knowledge.

Affiant further affirms that she is "sui-juris" and compentent to testify in this matter. Affiant submits this Affidavit based on her personal knowledge of its contents, and offers this sworn testimony for use in this, and any lawful proceeding:

(1)

1. I arrived at Valdosta State Prison on July 23, 2013. I had been an inmate at Johnson State Prison, but I was sent to Augusta State Medical Prison for a Doppler Study. Upon departing ASMP, I learned that I was to go to VSP and would not be returning to JSP. The Doppler Study was to determine if the pain in my legs was the result of blood clots, which I believed connected to my cessation (quite abruptly) of female hormones.

2. Once at VSP, I met the Medical Director, Dr. Moody, in regard to my chronic illness care for asthma and epilepsy. I spoke to him about being transgender and having Gender Identity Disorder (GID); I requested care (gender-affirming therapies). Dr. Moody inquired into whether I had ever been treated by a physician for hormones, in order to have more female attributes. I lied to Dr. Moody and stated that, yes I had been prescribed hormones by Bill Hogan, M.D., deceased. In truth, Dr. Hogan had been my "sugar-daddy" and hormone enabler until his suicide. Once incarcerated in County Jail (and in prison, too) I continued to treat myself by purchasing the hormones from inmates whom had prescriptions from non-prison physicians.

3. Dr. Moody told me that being off hormones would not cause my symptoms (bruising, pain in chest, back and legs, nausea, vomiting, dizziness, acid reflux, hot sweats, headaches, depression, anxiety, lethargy and suicidal fantasies). However,

(2)

his opinion was contrary from those rendered by other physicians and in articles written by leading and esteemed encrondologists and clinicians. On 8/5/13 I submitted a medical form to be seen at sick call for vomiting, nausea, horrible acid reflux, dizziness, headaches, chest, back and leg pains, and hot sweats. I also requested to see the psychiatrist for an evaluation of GID, and to determine appropriate treatment. I further listed symptoms of depression, anxiety, lethargy and suicidal preoccupations, including the self-castration of my testicles and penis. I also filed a grievance on the matter.

4. On 8/6/13 I went to medical to be seen by Nurse Frazier. Upon hearing a discription of my symptoms, she remarked that many of my symptoms were comparable to those of a woman in menopause. I intimated to Nurse Frazier that I was transgender and had been on hormones for several years. She said this made sense, and that any time one is on any medication, but especially hormones, for some time and then is abruptly deprived of the drug, it will wreak havoc on the physiological and psychological wellness of that individual. She expressed sympathy and referred me to be seen by the provider, Ms. Fry, on 8/15/13, whom I never met with.

5. On 8/7/13 I met with the psychiatrist, Dr. Roman, and discribed my problems and concerns, along with my symptoms of depression, anxiety, lethargy and suicidal urges. I told him that I have identified as female since for as long as I could

(3)

remember. I told him that I began growing out my hair, wearing make-up and dressing as a female around ages 11 or 12. I intimated how I attended school in the appearance of a female and how at different times of my life had gone by the names 'Christine' or 'Pasha'. I went into detail about the preoccupations with suicide and self-mutilation that come with my being stuck in a male body with no gender-affirming therapies.

6. I spoke on how when I was 16 I was hospitalized for attempting to kill myself after a teacher meanly lashed out, "you'll never really be a girl!" I detailed my trauma at being confined inside a male body with no release, and how I researched how to perform self-castration. From the age of 15 I began to illegally consume estrogen treatments and testosterone blockers to effect a chemic change inside my body that enhanced my feminine appearance, gave me a female shaped body and small breast.

7. I asked to be officially evaluated for GID and to have the appropriate necessary treatments prescribed. I directed Dr. Roman to the section of my file for June 19, 2013 where I had been "informally" diagnosed with Gender Identity Disorder/Gender Dysphoria by Dr. McKinnon at Johnson State Prison. She wrote, "I strongly suspect GID in this patient." Dr. Roman stated that he was not qualified to make such a determination, but would

(4)

write in my file that I should be referred to a qualified psychiatric professional. Upon departing from my session with Dr. Roman I ran into Mr. McKracken, the Mental Health Services Director. I repeated my conversation with Dr. Roman to Mr. McKracken. He told me that he and my mental health counselor, Mr. McCoy, were "looking into it."

8. On 8/9/13 I meet with my mental health counselor, Mr. McCoy, a licensed psychotherapist. He told me that he was in my corner and so was Dr. Moody but the GDC policy, and the decision of the GDC's Medical Director, Mr. Nichols, did not permit them to treat me. Mr. McCoy stated that I met "the criteria" for Gender Identity Disorder, according to the DSM IV and V. Medical Director Mr. Nichols told Mr. McCoy that a medical doctor, such as Dr. Moody, was the only person under policy that could evaluate and treat for GID; but only if the patient was being treated for GID prior to incarceration. Interestingly, the American Psychiatric Association (APA) has found that only psychotherapist, psychologist and psychiatrist are qualified to make such determinations. Simply possessing an M.D. does not qualify one to perform evaluations or render all necessary gender-affirmations.

9. I told Mr. McCoy about my physical and mental symptoms. I related my depression, anxiety, lethargy and impulses of testicular self-mutilation. I explained how I often day dream about fashioning a prison-made scaple to perform symptoms probably were a result of the discontinuation.

(5)
(6)

10. Lastly, I admitted the truth concerning my hormone therapy and Dr. Bill Hogan and my improper attainment of the medication to Dr. Moody.

11. On 8/20/13 I mailed out letters to Drs. Sharon Lewis and Billy Nichols, addressed to them at the Georgia Department of Corrections' State Office South in Forsyth, GA. The letters beseeched Drs. Lewis and Nichols to abandon their rigid, blanket administrative policy and treat me for my condition. Indigent Mail reciept from my facility dates it as 8/19/13

12. On 8/29/13 I wrote to both Mr. McCoy and Dr. Moody asking for their statements. Enclosed with each letter was a statement form.
On 9/2/13 I wrote to Mr. McCoy requesting to be seen for depression and dreams about castration, by the psychiatrist.
On 9/3/13 I wrote to Mr. McCoy asking that he note in my instutional file that I have requested an evaluation for GID and psychotherapy on three different occassions.

13. On 9/5/13 I met with Dr. Moody again and asked for a GID evaluation, psychotherapy and any other minimum yet appropriate primary and secondary treatment He declined to answer my request for GID evaluation, but stated he was not qualified to provide psychother

(7)

He then prescribed Zantac for my acid reflux and vomitting. He reiterated that Drs. Lewis and Nichols directed him ~~~~ to refer me to policy #VH47-0006. I asked why I was being denied treatment for a serious medical need such as transsexualism ~~~~ simply because I was not under care prior to incarceration: surely inmates with medical needs such as diabetes or schizophrenia are not penalized and denied treatment because they hadn't been recieving such treatment before incarceration. Dr. Moody stated that I asked a good question, one which I should take up with Drs. Lewis and Nichols. Before departing, I asked if he recieved my letter requesting his statement. He stated yes he had, but that he would not make such a statement. He advised me to have my lawyer subpeona the emails between him and Drs. Lewis and Nichols.

14. On 9/9/13 I wrote the grievance coordinator's office to inquire into the status of my grievance. I also advised the grievance coordinator that only twelve (12) days remained for my grievance to be produced with a response.

15. On 9/9/13 I wrote a request to the prison's Health Services Administrator, Ms. Barren, to ask questions about S.O.P. VH47-0006. I requested an appointment.

(8)

16. On 9/9/13 I also wrote the prison's head of mental health services, Mr. McKracken, asking for an appointment to speak with him about my concerns.

17. On 9/9/13 I recieved the response to my grievance. I requested an appeal form from my counselor and submitted the appeal via my counselor on 9/16/13.
On 9/10/13 I stopped Dr. Moody in passing as I was leaving medical for Profile Pickup. I asked him about a GID evaluation (as Mr. McCoy had told me that medical had to perform it). Dr. Moody said I needed to speak with mental health.
On 9/12/13 I recieved a letter from Ms. Vicki Barren, the Valdosta State Prison Health Services Administrator. The letter was dated 9/9/13 and was a response to my request to meet with the HSA in order to discuss and learn more about policy VH47-0006. Ms. Barren very politely denied my request.

18. On 9/16/13 I met with Mr. McCoy, my mental health counselor. He stated that it was his last day, but he would be writing some observations and suggestions in my file. He advised me that he wished he could do something to help me, but he was bound by the directives passed down by Drs. Lewis and Nichols. He observed my wrist and advised that I stop cutting or I may be locked down in the ACU.

(9)

19. On 9/25/13 I wrote another letter each to Drs. Sharon Lewis and Billy Nichols. (letter was mailed out 9/23/13) On 9/23/13 I met with the psychiatrist, Dr. Roman, and told him about my depression and anguish. I explained how while I'm resisting the urges, I strongly contemplate castration or suicide. He referred me to the chief psychologist, Dr. Harrison

20. On 10/1/13 I met with Dr. Harrison. I described to her how I had been fantasizing about cutting off my genitals. I talked about how the self-castration of Henry Boston on 9/30/13 effected me and made my urge to mutilate greater. Dr. Harrison informally diagnosed me with Gender Identity Disorder and said that in her opinion I needed to be treated for GID with hormone therapy. When I inquired into counseling, Dr. Harrison informed me that psychotherapy was not a treatment for transsexual patients but a monitoring tool to ensure that the patient's gender identification is legitimate and that no regret would occur from procedures intended to alter gender-perception. We discussed at length my history and other issues relating to my condition. Dr. Harrison made a comment at the end of our meeting; she stated that it would be unethical to attempt a treatment that endeavored to compel my contented-

(10)

ness with my current anatomical gender. When I asked her to explain, she stated that it would essentially be 'psychological torture,' referring to psychotherapy.

21. On 10/7/13 I wrote the Mental Health Director and requested a copy of my entire Mental Health Records. On 10/8/13 I met with MH Counselor DeWeese for emergency support because I was feeling desolate and depressed; I wanted to just cut off my genitals. Ms. DeWeese counseled me for about an hour and twenty minutes, looked up different cases that I could review and gave me advice about how to try to get treatment. She told me to stop cutting my wrist when she noticed my healing cuts.

22. On 10/8/13 I also met with GDC Internal Affairs investigator Street about my grievance appeal and challenge to policy VH47-0006. He informed me that he was here meeting with me to gather information concerning my grievance and then my complaint would be passed on to the appropriate officials for review.

23. On 12/19/13 I met with Dr. Harrison again and we talked about the psychological impact this whole situation was having on me. Dr. Harrison said that she would be more then willing to speak about Gender Identity Disorder, and on my behalf at Court.

24. By 2/6/14, past the one-hundred day deadline articulated under policy, I have still not recieved a response to my grievance appeal. However, the system shows it has been sent.

(11)

February 17, 2014

| GEORGIA DEPARTMENT OF CORRECTIONS<br>Standard Operating Procedures | | |
|---|---|---|
| **Functional Area:**<br>Health Services - Physical Health | **Reference Number:**<br>VH47-0006 | **Revises Previous Effective Date:**<br><br>12/01/96 |
| **Subject:**<br>Management of Transsexuals | | |
| **Authority:**<br>Wetherington/Oxford | **Effective Date:**<br>9/01/01 | Page 1 of<br>3 |

I. **POLICY**:

Inmates/probationers who, during intake health screening, are identified as a transsexual or in the process of attempting sexual reassignment surgery will be evaluated and pertinent information communicated to the Office of Health Services for recommendations for proper assignment and care. The general policy will provide "maintenance" of the inmate's/probationer's transgender status but not move the medical or surgical treatment any further along the continuum of transgender changes.

II. **APPLICABILITY**:

All State Diagnostic Centers, ASMP, Detention and Diversion Centers.

III. **RELATED DIRECTIVES**:

None.

IV. **DEFINITIONS**:

A. Transsexual: A person with the external genitalia and secondary sexual characteristics of one gender, but whose personal identification and psychosocial configuration is that of the opposite gender. Transsexuals may dress and behave as individuals of the opposite sex and may choose to use hormones or surgery to develop desired secondary sex characteristics. A transsexual is different from a transvestite or cross-dresser, who masquerades by dressing in the clothing of the opposite sex. Transsexuals are often classified as pre-operative (those who are taking hormones and undergoing change in dress and life style) and post-operative (those who have had sexual reassignment surgery).

B. Sexual Reassignment Surgery: Surgery to change the appearance of the external genitals.

| Functional Area: Health Services - Physical Health | Prev. Eff. Date: 12/01/96 | Page 2 of 3 |
|---|---|---|
| | Effective Date: 9/01/01 | Reference Number: VH47-0006 |

V. **ATTACHMENTS**:

None

VI. **PROCEDURE**:

A. Identification.

An inmate/probationer who, either by proclamation or by evidence in the medical history or physical examination is found to be a transsexual or in the process of sexual reassignment surgery will be referred to the Responsible Physician for evaluation. Questions regarding diversion center assignment of a transsexual should be referred to the Director of Health Services or designee in collaboration with Inmate Classification.

B. Evaluation

1. The process of evaluation will include but not be limited to:

    a. Current medications: The responsible physician may temporarily continue any medication until an informed decision can be made by the Office of Health Services.

    b. A Consent to Request or Release Medical Information Form (P78-0002.01, rev. 5/00; See Health Records Manual) will be initiated to obtain medical records from the physician who initiated the treatment.

    c. Routine diagnostic testing for the health screening will be continued and completed.

    d. Specialty consultation services specific to this condition (e.g., psychiatry, urology, and, if necessary, endocrinology) will be made through ASMP or appropriate outside resources.

2. The Statewide Clinical Services Supervisor in the Office of Health Services and the Statewide Medial Director will be contacted verbally (via telephone) by the originating institution only if there are questions regarding the disposition of the inmate/probationer.

| Functional Area: | Prev. Eff. Date: | Page 3 of |
| --- | --- | --- |
| Health Services - Physical Health | 12/01/96 | 3 |
| | Effective Date: | Reference Number: |
| | 9/01/01 | VH47-0006 |

3. During diagnostic processing, the inmate/probationer should be medically evaluated either at ASMP or through appropriate outside resources.

4. If questions regarding placement arise following the medical evaluation, the Health Services Director or designee and the Statewide Medical Director, in collaboration with Inmate Classification will make informed decisions regarding proper care and assignment of the inmate/probationer based on information received.

5. Surgical intervention will not be performed unless the physical health of the inmate/probationer is in jeopardy or the functional status of the inmate/probationer is in danger of deterioration.